EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| In re: | Querella |
|---|---|
| Nicolás Nogueras Cartagena | 2000 TSPR 55 |

Número del Caso: CP-1996-0002

Fecha: 28/03/2000

Oficina del Procurador General:    Lcda. Ivonne Casanova Pelosi

Abogado de la Parte Querellado:    Por Derecho Propio

Materia: Conducta Profesional

Este documento constituye un documento oficial del Tribunal Supremo que está sujeto a los cambios y correciones del proceso de compilación y publicación oficial de las decisiones del Tribunal. Su distribución electrónica se hace como un servicio público a la comunidad.

In re:

Nicolás Nogueras Cartagena          CP-96-2

PER CURIAM

San Juan, Puerto Rico, 28 de marzo de 2000

En las postrimerías de 1991, el Lcdo. Nicolás Nogueras Cartagena, en representación de sesenta y ocho (68) residentes de Villa Panamericana, presentó una demanda en daños y perjuicios contra la Corporación de Renovación Urbana y Vivienda ("CRUV"). Para esa fecha, el Lcdo. Nogueras Cartagena también fungía como Senador en la Asamblea Legislativa de Puerto Rico.

La acción instada por el Lcdo. Nogueras Cartagena, luego de ser consolidada con otra análoga, quedó ante la consideración del antiguo Tribunal Superior de Puerto Rico, Sala de San Juan.

El 5 de agosto de 1992, el Gobernador Interino, Dr. Salvador M. Padilla, nombró al Lcdo. y C.P.A. José L. Cotto Ramos como Síndico liquidador de la Oficina para la Liquidación de Cuentas de la CRUV ("OLCCRUV"). Luego de varias gestiones, el 14 de diciembre de 1992, el Lcdo. Cotto convocó a una reunión con los demandantes para auscultar la posibilidad de que éstos llegasen a un acuerdo con la CRUV. A esos fines, se ofreció a cada uno de los demandantes la compra de sus viviendas por $37,000 y la concesión de la suma de $8,000 por concepto de daños y perjuicios. En esta reunión no estuvieron presentes ni los representantes legales del mencionado Síndico ni el Lcdo. Nogueras Cartagena.

El Lcdo. Nogueras Cartagena representó a los demandantes en los conversaciones subsiguientes. Así las cosas, el 29 de diciembre de 1992, el Lcdo. Nogueras Cartagena y el Síndico, José L. Cotto, suscribieron un acuerdo transaccional para disponer del pleito en cuanto a los clientes del Lcdo. Nogueras Cartagena. En el mismo, se acordó que los demandantes recibirían $45,000 y que su representante legal, Lcdo. Nogueras Cartagena, recibiría el 15% como honorarios.[1] Cabe señalar que la representación legal del Síndico no participó en el acuerdo suscrito.[2]

_____

[1] En el acuerdo se consignó que el Lcdo. Nogueras estaba rebajando la cantidad de honorarios contingentes pactada de un 20% a un 15%.

[2] Ese mismo día, el síndico formalizó otra estipulación con otros demandantes de la Villa Panamericana.
   Posteriormente, se celebró un "status conference", en este otro caso, donde comparecieron los representantes

Presentada la mencionada estipulación ante el tribunal de instancia, dicho foro dictó sentencia parcial el 13 de enero de 1993. En dicho dictamen, el tribunal incorporó la estipulación suscrita por las partes y dictó sentencia, dando por desistido con perjuicio el pleito. Los días 2 y 3 de febrero de 1993, el Lcdo. Nogueras Cartagena envió dos cartas al Síndico solicitando se satisficieran sus honorarios de abogado, esto es, el 15% del total a recibir por sus clientes como resultado de la estipulación. A raíz de dicho requerimiento, el Síndico emitió el cheque núm. 2150 por la cantidad de $200,000 en concepto de pago parcial al Lcdo. Nogueras Cartagena.

Transcurrido poco más de un mes, luego de emitida la sentencia, los nuevos representantes legales del Síndico comparecieron al tribunal e informaron que las estipulaciones suscritas requerían más estudio[3]. En específico, los abogados interesaban indagar si todos los demandantes eran acreedores de los beneficios de la transacción. Para ello, los nuevos abogados del Síndico solicitaron que se dejase sin efecto la finalidad de la sentencia hasta tanto concluyeran el estudio. Es de notar

---

legales del Síndico y alegaron que no habían tomado parte en la estipulación. Por ello, el tribunal le concedió a los abogados 45 días para analizar la estipulación. En ese momento, nada se dispuso en torno al caso transigido por el Lcdo. Nogueras Cartagena.

[3] Como resultado de las elecciones generales celebradas en el mes de noviembre de 1992, y luego de que la nueva administración de gobierno hubiera asumido el control del Gobierno, el Síndico y los abogados que le habían representado hasta ese momento, renunciaron a sus cargos.

que, para esa fecha, tanto el término establecido en la estipulación para el pago total a los demandantes, como el plazo para solicitar reconsideración o apelar la sentencia, habían concluido.

Ante el pedido de los nuevos representantes del Síndico, ese mismo día, el tribunal emitió una orden para paralizar, por cuarenta y cinco (45) días, los pagos ordenados por la sentencia en la que habían aprobado la estipulación. Asimismo, el tribunal citó a las partes para una vista a celebrarse el 15 de marzo de 1993. <u>Al momento de la emisión de la orden de paralización, se había efectuado el cierre de 15 contratos de compraventa con motivo de la estipulación y la sentencia aprobando la misma</u>.

La paralización decretada por el tribunal, y el monto de los honorarios recibidos por el abogado querellado, adquirieron notoriedad pública. Una de las voces que cuestionaba la transacción fue el nuevo Síndico, Lcdo. Antonio Cabrero. Así pues, el 4 de marzo de 1993, el Lcdo. Nogueras, <u>como Vicepresidente del Senado</u>, suscribió dos comunicados de prensa exhortando al nuevo Síndico a que cumpliera con las estipulaciones acordadas.

El 12 de marzo de 1993, el Lcdo. Cabrero presentó una Moción de Relevo de Sentencia al amparo de la Regla 49.2 de Procedimiento Civil. Planteó en la misma que la estipulación aprobada por el Síndico anterior (Lcdo. Cotto)

---

De hecho, el Gobernador Pedro Rosselló designó al Lcdo. Antonio Cabrero como nuevo Síndico de la C.R.U.V.

era nula por no haber sido ratificada por la Junta Ratificadora de la Oficina del Síndico para la Liquidación de la C.R.U.V. Eventualmente, el tribunal de instancia dejó sin efecto la sentencia anteriormente dictada. El relevo de sentencia advino final y firme.

Uno de los residentes de Villa Panamericana[4] se quejó ante este Tribunal de la conducta observada en este caso por el Lcdo. Nogueras Cartagena. Remitimos el asunto a la Oficina del Procurador General de Puerto Rico para la correspondiente investigación e informe. Recibido el mismo, instruimos al Procurador General para que radicara la correspondiente querella, lo cual hizo. En la querella se le imputan dos cargos al Lcdo. Nogueras Cartagena, a saber: (1) violación al Canon 14 de Ética Profesional por emitir un comunicado de prensa comentando un asunto que se encontraba sub-judice; y (2) infringir el Canon 38 de Ética Profesional pues su conducta, al negarse a devolver los honorarios concedidos en virtud de la estipulación dejada sin efecto, tuvo la apariencia de ser impropia.

El Lcdo. Nogueras Cartagena contestó la querella. En síntesis, planteó que, al suscribir el comunicado de prensa ya no era el abogado del caso --pues la nueva representante legal era la Lcda. Rosa Nogueras[5]--, y que el Procurador no estableció que se le diera curso público al comunicado. Además, arguyó que, de todas formas, "una exhortación pública de esa naturaleza no interfiere con la función

---

[4] La señora Lilliam Tapia.

judicial, ni con el caso ni es publicidad indebida del mismo, ni era su opinión como abogado sobre un pleito pendiente." Por ello, a su juicio, la expresión está amparada en el manto constitucional de libertad de expresión <u>tanto como ciudadano y como legislador</u>. En cuanto al asunto de la devolución de los honorarios, el querellado indicó que, tanto él como la sociedad legal de gananciales, compuesta por su esposa y él, habían adquirido un interés propietario en la cantidad pagada; que el pago efectuado era el pago total de una Sentencia que por sus propios términos debía ser satisfecha en su totalidad. Por último, planteó que el asunto se encuentra sometido ante la consideración del Tribunal de Primera Instancia donde las partes litigarían, con todas las garantías del debido proceso de ley, la controversia.

Luego de varios trámites, designamos al ex-Juez Superior, Lcdo. Ramón Gómez Colón, para que actuara como Comisionado Especial. Así las cosas, las partes le informaron al Comisionado Especial que la controversia era una de estricto derecho, por lo que procedieron a estipular los hechos. Ello, junto a la teoría de derecho de cada parte, se consignó en un documento titulado "informe de conferencia entre abogados." Luego de sometido el informe, el querellado solicitó expresar para récord unas observaciones en torno a la trayectoria del caso, lo cual se le permitió.

---

[5] La Lcda. Rosa Nogueras es hermana del abogado querellado.

Finalmente, el Comisionado Especial rindió su Informe ante este Tribunal. En el mismo, simplemente, explicó que se habían estipulado los hechos y consignó que incorporaba al expediente la transcripción de los procedimientos. En fin, no expresó opinión alguna sobre los méritos de la querella. Estando en posición de resolver el asunto planteado, procedemos a así hacerlo.

I

Los Cánones de Etica Profesional establecen las pautas mínimas que deben guiar a los miembros de la clase togada en el desempeño de su delicada faena. In re: Filardi Guzmán, res. el 23 de enero de 1998, 144 D.P.R. __ (1998). Huelga decir que lo ideal es que todos los abogados actúen a un nivel superior --y no al margen-- de los mismos.

Se imputa al abogado querellado violentar las disposiciones del Canon 38 de Ética Profesional, 4 L.P.R.A. Ap. IX, C. 38, el cual ordena evitar hasta la apariencia de conducta impropia, toda vez que no devolvió los honorarios que obtuvo a raíz de una sentencia que fue dejada sin efecto. El citado Canon, en lo pertinente, dispone que:

> "[e]l abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia. En su conducta como funcionario del tribunal, deberá interesarse en hacer su propia y cabal aportación hacia la consecución de una mejor administración de la justicia.[...]" (Énfasis suplido).

"La apariencia de impropiedad puede ser muy lesiva al respeto de la ciudadanía por sus instituciones de justicia y por la confianza que los clientes depositan en sus abogados". In re: Rojas Lugo, 114 D.P.R. 687, 690 (1983). En varias ocasiones nos hemos expresado en torno al aspecto específico de la apariencia de conducta impropia. Examinemos algunos de nuestros pronunciamientos.

En In re: Toro Cuberge, res. el 2 de abril de 1996, 140 D.P.R. ___ (1996), determinamos que el interés de Toro Cuberge en vender su finca a su cliente "creó una apariencia de influencia indebida" infringiéndose de esa manera el Canon 38.

Por otro lado, en In re: López de Victoria, res. el 6 de abril de 1994, 135 D.P.R. ___ (1994), entendimos que la actuación del querellado aparentó ser impropia porque "aunque los comparecientes no eran sus clientes, ni [el querellado] autorizó el documento, su "participación" en la transacción" dio la apariencia de legalidad y confiabilidad a la misma cuando en realidad no lo era.

Asimismo, en In re: Rodríguez Ortiz, res. el 6 de abril de 1994, 135 D.P.R. ___ (1994), censuramos la conducta de una abogada que se comunicó con el Director del Panel Central de Investigaciones de este Tribunal en relación a un caso pendiente. Concluimos allí que la conducta aparentó ser impropia y, por ende, violatoria del antes mencionado Canon 38.

Por último, en In re: Tormos Blandino, res. el 28 de marzo de 1994, 135 D.P.R. ___ (1994), expresamos que, al

presentar cierto documento al Registro de la Propiedad, cuya validez estaba siendo cuestionada en el foro judicial, la actuación del abogado daba la apariencia de impropiedad.

## II

En cuanto al caso de autos, no debe haber duda de que la conducta del querellado, Lcdo. Nogueras Cartagena, trascendió los linderos fijados por el Canon 38. Veamos por qué.

El querellado pactó honorarios contingentes con sus clientes. El Canon 24 de Ética Profesional, supra, dicta la pauta a seguir en torno al asunto de la fijación de honorarios de abogado en Puerto Rico. La norma descansa en la premisa de que la abogacía es parte integral de la administración de la Justicia y no un mero negocio lucrativo.

El citado Canon 24 caracteriza los honorarios contingentes como la excepción cuando de remuneración se trata. Así pues, los honorarios contingentes no constituyen el método usual para fijar lo que justamente debe pagarse a un abogado por sus servicios. Por mandato expreso del propio Canon 24, los honorarios contingentes se permiten sólo en casos especiales, debidamente justificados. Por ello, en el pasado hemos expresado que los honorarios contingentes deben mirarse "con prevención, que debe[n] evitarse, ya que son muchas las razones fundamentales que militan en su contra". Colón v. All Amer. Life & Cas. Co., 110 D.P.R. 772 (1981).

Ciertamente, ante la situación económica de los demandantes residentes en la Villa Panamericana, los honorarios contingentes pactados por el querellado estuvieron justificados. El problema aquí es otro. Por definición, al acceder a ese tipo de remuneración el abogado sólo será compensado en la eventualidad de que sus representados resultasen victoriosos en el pleito. En el caso de autos, el querellado cobró sus honorarios contingentes en virtud de un acuerdo transaccional. Hasta ese momento, no había problema alguno. Sin embargo, toda vez que la determinación del tribunal, al dejar sin efecto la transacción por estipulación y la sentencia aprobando la misma, advino final, firme e inapelable debemos preguntarnos si el Lcdo. Nogueras Cartagena tenía la obligación, cuando menos ética, de devolver los honorarios contingentes que le habían sido satisfechos por adelantado.

Fijamos la pauta a seguir: un abogado que recibe honorarios contingentes en virtud de una estipulación, que luego es revocada, tiene que devolver lo recibido. No hacerlo crea la apariencia de que el abogado actuó impropiamente toda vez que, para todos los efectos prácticos, éste no tenía derecho a recibir dichos honorarios contingentes; llana y sencillamente, sus clientes no prevalecieron en definitiva.

Ahora bien, debemos reconocer que la situación a la que hoy nos enfrentamos no es tan sencilla como parece. El Lcdo. Nogueras Cartagena representaba a sesenta y ocho (68)

residentes al suscribir la estipulación con el Síndico[6].

Cuando el tribunal paralizó los pagos, <u>ya se habían cerrado</u> <u>las escrituras correspondientes a 15 de los clientes del</u> <u>Lcdo. Nogueras Cartagena</u>. Aparentemente, el Síndico nunca ha solicitado la devolución del dinero en esos 15 casos.[7] Ello no obstante, somos de la opinión que el Lcdo. Nogueras Cartagena, al ser revocada *de jure* la estipulación y sentencia en virtud de la cual recibió los mismos, venía en la obligación de devolver los honorarios que había recibido. Esa devolución, claro está, es sin menoscabo a los planteamientos que tenga a bien hacer el querellado ante el Tribunal de Primera Instancia. Es decir, luego de consignar el dinero, entonces el querellado podrá hacer los planteamientos correspondientes en el tribunal y éste, por supuesto, en su día tendrá que adjudicarlos.

No obstante entender que, al no devolver los honorarios que le habían sido satisfechos, el Lcdo. Nogueras efectivamente violó el Canon 38 de Etica

---

[6]     Cabe señalar que las partes estipularon, ante el Comisionado Especial que designamos, que el Síndico original —el Lcdo. José L. Cotto— <u>no</u> fue presionado de forma alguna por al Lcdo. Nogueras para transigir el caso de Villa Panamericana.

[7]     El querellado alega, y el procurador no refuta, que la Oficina del Síndico nunca ha pedido la restitución del dinero recibido por los demandantes que ya habían cerrado antes de que el tribunal paralizara los pagos. Así pues, de ser cierto lo aseverado por el Lcdo. Nogueras Cartagena, en torno a los 15 contratos que ya habían sido pagados y respecto a los cuales la Oficina del Síndico no ha realizado ninguna gestión para anularlos, el tribunal de instancia tendrá que adjudicar, en su día, si el Lcdo. Nogueras tiene derecho a recibir los honorarios contingentes correspondientes a esos 15 clientes; ciertamente <u>no</u> tiene derecho alguno a los honorarios

Profesional, consideramos procedente únicamente <u>censurarlo</u>

por la conducta en que incurrió en vista de la situación

fáctica del caso.


III

Mediante el segundo cargo, se le imputa al querellado

que, al suscribir un comunicado de prensa, violentó el

Canon 14 de Ética Profesional, 4 L.P.R.A. Ap. IX, C. 14.[8]

_____

cobrados que están relacionados con los restantes
demandantes.

[8] El comunicado leía:

> "Estoy exhortando al pueblo de Puerto Rico, en particular a los residentes de Villa Panamericana para que se tiren a las calles y protesten por la actitud injusta y discriminatoria asumida por el Síndico de la C.R.U.V. contra estos humildes puertorriqueños.
>
> Los residentes deben protestar ante los atropellos e injusticias y reclamar del Síndico de la C.R.U.V. [que] cumpla con la sentencia del Tribunal. La actitud asumida por estas oficinas deben[sic] investigarse a fondo.
>
> Las condiciones infrahumanas en que están viviendo estos residentes de Villa Panamericana, merecen atención especial de parte de nuestro gobierno. No podemos continuar dandole[sic] la espalda a los pobres en Puerto Rico y el tratar de justificar lo injustificable amerita sería consideración, pues se trata de seres humanos, de excelentes puertorriqueños, viviendo en carne propia el dolor del sufrimiento, la marginación.
>
> El Síndico de la C.R.U.V. está en la obligación de terminar con este asunto, el tribunal dictó sentencia, una parte de los residentes de Villa Panamericana ya cobró, todavía quedan otros que esperan por sus dineros. No hay razón para esperar más.
>
> Cualquier acción futura de los residentes de Villa Panamericana está más que justificada. En el caso que yo gane[sic] los tribunales de Puerto Rico, todavía se le debe dinero. Los residentes de Villa Panamericana han sido tratados injustamente. La sentencia se le debe pagar sin más dilaciones a esta gente que tanto lo necesita, insisto que está más que justificada cualquier futura protesta,

El Canon 14 dispone que:

"[e]l abogado debe abstenerse de publicar o de cualquier manera facilitar la publicación en periódicos o a través de otros medios informativos, <u>detalles u opiniones sobre pleitos pendientes o que señalen la probabilidad de litigios futuros, pues tales publicaciones pueden obstaculizar la celebración de un juicio imparcial y perjudicar la debida administración de la justicia</u>. En caso de que las circunstancias extremas de un pleito específico justifiquen ofrecer una información al público, será impropio el hacerlo anónimamente. Una referencia unilateral o ex parte a los hechos de un caso debe limitarse a citas tomadas de los récord y documentos archivados en los tribunales; pero aun en estos casos extremos, es preferible abstenerse de ofrecer tales declaraciones." (Énfasis suplido.)

Este asunto entraña una situación un tanto más compleja que la anterior; se asoma la posibilidad, aun cuando remota, de un conflicto constitucional. Ello por razón de que se alega que las expresiones del querellado fueron hechas en su capacidad de Vicepresidente del Senado de Puerto Rico.

La Cláusula de Inmunidad Parlamentaria, Artículo III, Sec. 14 de nuestra Constitución, "[c]onfiere inmunidad a los miembros de la Asamblea Legislativa contra responsabilidad civil o criminal <u>respecto a sus acciones en la esfera de los procesos legislativos legítimos</u>. Constituye barrera absoluta contra interferencias del ejecutivo o el poder judicial en dichos procesos, aunque no elimina la facultad revisora de los foros judiciales, sino que evita las distracciones que conlleva tener que acudir a

---

hasta lograr [que] se cumpla con la sentencia del tribunal".

los tribunales a defender los actos legislativos." <u>Hon. Charlie Rodríguez, Ex parte</u>, 99 TSPR 104, res. el 30 de junio de 1999. (Enfasis suplido.)

Aunque la inmunidad parlamentaria ha sido interpretada de forma liberal y amplia, <u>la misma no constituye un privilegio absoluto</u>. El asunto medular usualmente consiste en determinar <u>lo que es o no una actividad legislativa legítima</u>. "Solamente están protegidas actuaciones realizadas en el curso del proceso de formular legislación, es decir, aquéllas que son claramente parte del proceso legislativo." <u>Id.</u>, citando a Serrano Geyls, R., <u>Derecho Constitucional de E.U. y P.R.</u>, Vol. I, pág. 638 (1986).[9]

Ahora bien, en recta metodología adjudicativa, debemos señalar que <u>no</u> debemos dilucidar asuntos constitucionales cuando es factible resolver la controversia planteada por otros fundamentos. <u>Hernández Torres</u> v. <u>Misla Aldarondo</u>, Opinión y Sentencia de 31 de enero de 1992; <u>Soster</u> v. <u>Echlin of Puerto Rico, Inc.</u>, 126 D.P.R. 781 (1990); <u>P.I.P.</u> v. <u>Comisión Estatal de Elecciones</u>, 120 D.P.R. 580 (1988); <u>Bonilla</u> v. <u>Chardón</u>, 118 D.P.R. 599 (1987). <u>En el caso de autos, cualquier expresión sobre este posible dilema constitucional realmente constituiría dicta</u>.

Si bien es cierto que el Lcdo. Nogueras Cartagena siempre alegó que no recordaba si el comunicado de prensa

---

[9] En el pasado, nos hemos enfrentado a la dicotomía que surge cuando un abogado labora en un puesto importante en otra rama de gobierno. Cf. <u>In re Secretario de Justicia</u>, 126 D.P.R. 463 (1990); <u>In re Secretario de Justicia</u>, 118 D.P.R. 827 (1987). Sin embargo, no hemos tenido la oportunidad de abordar una controversia como la de autos.

se había publicado o no, las partes <u>únicamente estipularon</u> que: "el licenciado Nogueras, <u>en su capacidad de Vicepresidente del Senado</u>, suscribió dos <u>comunicados de prensa</u> en los cuales exhortaba públicamente al nuevo Síndico Liquidador a que continuara honrando las estipulaciones acordadas." (Enfasis suplido.)

Para demostrar que el querellado infringió el Canon 14 de Ética Profesional, supra, el Procurador General tenía que establecer, entre otras cosas, <u>que al comunicado de prensa en cuestión se le dio curso público</u>. La estipulación de las partes <u>sólo</u> revela que el querellado suscribió el comunicado. Por supuesto, por su naturaleza, un comunicado de prensa de ordinario es una exhortación pública; no obstante, no puede considerarse dicha aseveración -exhortación pública- como que el querellado aceptó en la estipulación que el comunicado, en efecto, llegó a la palestra pública. Además, es de notar que el Procurador General incluyó, como parte de su prueba, varios artículos periodísticos relacionados con el caso. De ninguno de ellos surge, o se puede inferir, que dichos artículos tuvieron como base los referidos comunicados de prensa. Por último, debemos señalar que tiene gran peso en nuestra decisión el hecho de que, a la fecha del comunicado --4 de marzo de 1993-- la Sentencia continuaba en plena vigencia y la solicitud del nuevo Síndico sólo era para evaluar la transacción y <u>no</u> interrumpió el término para recurrir al foro apelativo como tampoco tuvo el efecto de paralizar los procedimientos. Tampoco a esa fecha el Síndico había pedido

el relevo de sentencia por lo que la misma, era final y firme cuando se suscribió el comunicado en controversia. En consecuencia, lo que hizo el querellado fue solicitar que se cumpliera con una sentencia que era válida en ese momento. Así pues, es forzoso concluir que el cargo imputado no resulta procedente.

## IV

En virtud de todo lo anteriormente expuesto, nos limitamos a <u>censurar enérgicamente</u> al Lcdo. Nogueras Cartagena por infringir el Canon 38 de Ética Profesional. Apercibimos, además, al querellado de que, en el futuro, deberá ejercer mayor cautela y atenerse estrictamente a los postulados que regulan la profesión de la abogacía.

Se dictara Sentencia de conformidad.

En el Tribunal supremo de puerto rico

In re:

Nicolás Nogueras Cartagena            CP-96-2


SENTENCIA

San Juan, Puerto Rico, 28 de marzo de 2000

Por los fundamentos expuestos en la Opinión Per Curiam que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia censurando enérgicamente al Lcdo. Nicolás Nogueras Cartagena por infringir el Canon 38 de los Cánones de Etica Profesional[1], apercibiéndosele a éste, además, de que en el futuro, deberá ejercer mayor cautela y atenerse estrictamente a los postulados que regulan la profesión de la abogacía.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo. El Juez Asociado señor Negrón García emitió Opinión disidente. La Juez Asociada señora Naveira de Rodón concurre en el resultado sin opinión escrita. El Juez Asociado señor Corrada del Río inhibido.

Isabel Llompart Zeno
Secretaria del Tribunal Supremo

_____

[1] El Lcdo. Nogueras Cartagena viene en la obligación de devolver los honorarios que recibió, ello sin menoscabo de los planteamientos que tenga a bien hacer ante el Tribunal de Primera Instancia.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

In re:

Nicolás Nogueras
Cartagena                    CP-96-2


Opinión Disidente del Juez Asociado señor Negrón García


San Juan, Puerto Rico, a 28 de marzo de 2000

I

El trasfondo procesal que, en lo pertinente, enmarca esta querella se remonta al 13 de enero de 1993, en que el Tribunal Superior, Sala de San Juan (Juez, Hon. Wilfredo Alicea López), dictó Sentencia Parcial, en el caso Civil KAG-91-1711 dando por desistido el pleito e incorporando la Estipulación y Acuerdo de Compra-Venta, presentada por los demandantes a través del Lcdo. Nogueras Cartagena y el Síndico Especial de la Oficina de Renovación Urbana y Vivienda. Sin embargo, poco después, el 16 de febrero, la C.R.U.V. solicitó formalmente al Tribunal que dejase sin efecto la mencionada

sentencia parcial. Dicha petición fue concedida, y el 23 de febrero **se dispuso la paralización de los pagos ordenados** por la sentencia parcial por un período de 45 días y se citó las partes a una vista para el **15 de marzo.** Dada la negativa de la Junta Ratificadora de ratificar el acuerdo transaccional, el 26 de mayo, el Tribunal dejó sin efecto permanentemente la aludida sentencia.

No podemos suscribir la respetable Opinión mayoritaria pues entendemos que la "exhortación pública" que hizo el Lcdo. Nicolás Nogueras Cartagena, en su carácter de Vicepresidente del Senado de Puerto Rico, a través del Comunicado de Prensa fechado el 4 de marzo solicitando al Síndico Liquidador a que cumpliese las estipulaciones acordadas, fue realizada conociendo que la legitimidad de dichas estipulaciones estaba en controversia <u>sub judice</u>;[10] y ese proceder infringió los Cánones 11 y 14 de Ética Profesional. Veamos.

II

[10] El Comunicado leía:

"Estoy exhortando al pueblo de Puerto Rico, en particular a los residentes de Villa Panamericana para que se tiren a las calles y protesten por la actitud injusta y discriminatoria asumida por el Síndico de la C.R.U.V. contra estos humildes puertorriqueños.

Los residentes deben protestar ante los atropellos e injusticias y reclamar del Síndico de la C.R.U.V. [que] cumpla con la sentencia del Tribunal. La actitud asumida por estas oficinas deben[sic] investigarse a fondo.

Las condiciones infrahumanas en que están viviendo estos residentes de Villa Panamericana, merecen atención especial de parte de nuestro gobierno. No podemos continuar dandole[sic] la espalda a los pobres en Puerto Rico y el tratar de justificar lo injustificable amerita seria consideración, pues se trata de seres humanos, de excelentes puertorriqueños, viviendo en carne propia el dolor del sufrimiento, la marginación.

El Síndico de la C.R.U.V. está en la obligación de terminar con este asunto, el tribunal dictó sentencia, una parte de los residentes de Villa Panamericana ya cobró, todavía quedan otros que esperan por sus dineros. No hay razón para esperar más.

Cualquier acción futura de los residentes de Villa Panamericana está más que justificada. **En el caso que yo gane[sic] los tribunales de Puerto Rico, todavía se le debe dinero.** Los residentes de Villa Panamericana han sido tratados injustamente. **La sentencia se le debe pagar sin más dilaciones a esta gente que tanto lo necesita,** insisto que está más que justificada cualquier futura protesta, hasta

El Canon 11, _in fine_, manda al abogado que ocupa cargo público abstenerse de ejercer influencia o presión indebida en los trámites judiciales.

Por otra parte, y en protección de la debida administración de la justicia —para evitar la obstaculización de procesos judiciales imparciales—, el Canon 14 establece que todo abogado no debe facilitar de cualquier forma la publicidad, a través de cualquier medio informativo, su opinión respecto a pleitos pendientes o a hechos que señalen la probabilidad de casos en el futuro. In re Clavell Ruiz, 131 D.P.R. 500 (1992).

**El texto del Comunicado del Lcdo. Nogueras Cartagena, haciendo uso de sus prerrogativas senatoriales, constituyó un claro intento de influenciar un proceso pendiente ante los tribunales, y evidentemente violentó la letra y el espíritu de estos preceptos deontológicos, particularmente si recordamos que** era abogado de récord en el proceso y tenía interés pecuniario directo en el resultado. **Mediante su Comunicado, pidió al Síndico de la C.R.U.V. el cumplimiento de una sentencia que conocía había sido paralizada y cuestionada, incitando a la obstrucción de la debida administración de la justicia.**

## III

**No nos persuade la tesis del Lcdo. Nogueras Cartagena respecto a que la controversia era de naturaleza pública, y mediante la misma se intentaba perjudicar su carácter como funcionario público. Argumenta, que su exhortación se ajustó a una función pública, "expresándose conforme a su conciencia en medio de una pugna dentro del partido de gobierno, contra los intereses creados que perjudicaban la integridad de la función pública."** Informe de Conferencia entre Abogados, 16 de abril de 1997, pág. 16.

**Es norma de arraigo constitucional que todo miembro de la Asamblea Legislativa goza de inmunidad parlamentaria por sus votos y**

---

lograr [que] se cumpla con la sentencia del tribunal." (Énfasis suplido).

expresiones en una u otra cámara o en cualquiera de sus comisiones. Art. III, Sec. 14, Constitución de Puerto Rico. Sin embargo, la inmunidad legislativa no constituye un privilegio absoluto, "[s]olamente están protegidas actuaciones realizadas en el curso del proceso de formular legislación, es decir, aquellos que son claramente parte del proceso legislativo." Sobre que constituyen procesos legislativos legítimos, véase Romero Barceló v. Hernández Agosto, 115 D.P.R. 368 (1984).

Los propios argumentos del Lcdo. Nogueras Cartagena evidencian que sus expresiones en el Comunicado de Prensa no están cobijadas por la inmunidad parlamentaria. Primero, dicho Comunicado versaba sobre una controversia privada pendiente ante los Tribunales, en la cual el Lcdo. Nogueras Cartagena representaba a unos demandantes. Segundo, de ser cierto que su función pública estaba siendo atacada y, por ende, su expresión fue en defensa de ese ataque, entonces no estaríamos ante actuaciones legislativas protegidas, sino por el contrario, actuaciones políticas claramente no cobijadas por la inmunidad parlamentaria. A modo ilustrativo, véanse: United States v. Brewster, 408 U.S. 501 (1972); Gravel v. United States, 408 U.S. 606 (1972).

No debemos abdicar a nuestro poder disciplinario, cuando nos enfrentamos a conductas antiéticas de abogados-legisladores que pretenden cubrir sus faltas bajo el manto de inmunidad parlamentaria. "Los abogados que se sientan en la legislatura son también funcionarios de esta corte" —In re Rodríguez Torres, 106 D.P.R. 698 (1978), Op. dis., Negrón García, Juez— y su conducta está limitada por los Cánones de Ética Profesional.

ANTONIO S. NEGRÓN GARCÍA
Juez Asociado